## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
## The Honorable Michael E. Romero

In re:                                         Case No. 11-21140 MER

SANDRA C. MALUL,                               Chapter 7

      Debtor.

## ORDER

If the uncertainty of outcomes in marijuana-related bankruptcy cases were an opera, Congress, not the judiciary, would be the fat lady.  Whether, and under what circumstances, a federal bankruptcy case may proceed despite connections to the locally "legal" marijuana industry remains on the cutting-edge of federal bankruptcy law.  Despite the extensive development of case law, significant gray areas remain.  Unfortunately, the courts find themselves in a game of whack-a-mole; each time a case is published, another will arise with a novel issue dressed in a new shade of gray.  This is precisely one such case.

## BACKGROUND

### A.     The Original Bankruptcy Filing and the State Court Action

Sandra C. Malul ("**Malul**") initially filed this case under Chapter 7 of the Bankruptcy Code on May 5, 2011 ("**Petition Date**").  Cynthia Skeen served as Chapter 7 Trustee ("**Skeen**").[1]  Malul received a standard Chapter 7 discharge on September 13, 2011.[2]  On March 26, 2014, Skeen filed a Chapter 7 Trustee's Final Report reflecting total realized gross receipts of $7,950, resulting in a 52% pro rata distribution on account of priority tax claims.[3]  No distributions were made on account of general pre-petition unsecured claims, which totaled $76,290.62.[4]  The Court entered an order approving Skeen's final report and closing this case on July 3, 2014.[5]

---

[1] ECF No. 10.

[2] ECF No. 16.

[3] ECF No. 41.

[4] *Id.*

[5] ECF No. 49.

Nearly five years later, on November 8, 2018, Malul filed a Motion to Reopen this case to disclose a possible asset on her Schedule A/B.[6] Malul subsequently filed a supplemental brief in support of the Motion to Reopen.[7]

Through these initial filings, Malul represented on April 30, 2010, she invested $50,000 in a business called Heartland Caregivers, LLC ("**Heartland**"), and executed a subscription agreement setting forth the terms of her investment ("**Subscription Agreement**"). The purpose of Heartland was to cultivate and sell medical marijuana to dispensaries in Colorado. Malul's investment in Heartland failed, and, by April 12, 2011, Heartland's accountants reported Malul's entire $50,000 investment was lost.

Because Malul's investment in Heartland was a complete loss prior to the Petition Date, Malul's pre-discharge filings disclosed neither the investment nor related claims against Heartland or its principal John Fritzel ("**Fritzel**"). Malul claims she first became aware of possible claims against Heartland and Fritzel five years later, in June 2016, upon reading a story in the Denver Post about Fritzel's marijuana businesses. The Denver Post article prompted Malul to contact counsel about the loss of her investment. After some investigation, Malul commenced a civil suit in Arapahoe County District Court ("**State Court**") on January 13, 2017, Case No. 2017CV30101 ("**State Court Action**").

Malul filed a copy of her Amended Complaint in the State Court Action as an attachment to the Motion to Reopen.[8] According to the Amended Complaint, as consideration for her investment, Fritzel and Heartland promised through the Subscription Agreement to pay Malul 30%, or her pro rata share, of all net revenues from Heartland's operations until Malul's initial investment was paid back.[9] Further, Fritzel and Heartland promised to pay her 10%, or her pro rata share, of "all net revenues for the life of the

---

[6] EC No. 50 ("**Motion to Reopen**") and ECF No. 52 ("**Reopen Supplement**").

[7] ECF No. 52.

[8] ECF No. 50-5 ("**Amended Complaint**"). The Court's recitations of the facts alleged in the Amended Complaint do not constitute findings on the truth of the matters asserted.

[9] Amended Complaint at ¶ 10.

business."[10]  Nonetheless, Malul received no voting rights or managerial powers in Heartland.[11]

According to the Amended Complaint, early on, Malul and other Heartland investors became concerned they were not seeing returns and undertook to learn about the status of their investments.[12]  Despite repeated efforts, Fritzel did not provide investors meaningful responses to their requests for information.[13]

Frustrated and stymied, Malul and the other Heartland investors were surprised to learn from the Denver Post article Fritzel "was actually quite successful and had managed to put together a marijuana empire" through an entity called Lightshade Labs LLC ("**Lightshade**").[14]  Fritzel is quoted in the article expressly tying his current marijuana business success to his initial venture, "Heartland Pharmacy," which he said was "now called Lightshade Labs."[15]

Malul's investigation uncovered documents that allegedly enabled her to trace her investment from Heartland to Fritzel's other operating entities.[16] Specifically, Malul alleges Fritzel used $162,500 raised from Heartland investors to buy marijuana plants, growing equipment, and related business services.[17]  The investigation also discovered Fritzel in fact dissolved Heartland shortly after taking Malul's investment, then incorporated Lightshade and diverted Heartland's assets into Lightshade's operations, personally benefitting Fritzel while leaving Malul and the other Heartland investors high and dry.[18]  The Amended Complaint in the State Court Action

---

[10] *Id.*

[11] *Id.* at ¶ 17.

[12] *Id.* at ¶ 19.

[13] *Id.* at ¶¶ 20-24.

[14] *Id.* at ¶ 26.

[15] *Id.* at ¶ 29.

[16] *Id.* at ¶ 32.

[17] *Id.* at ¶¶ 33-37.

[18] *Id.*

is rather specific in alleging the exact steps taken by Fritzel to convert Heartland's assets and business to Lightshade.

Ultimately, the State Court Action sets forth thirteen claims against Heartland, Fritzel, and Lightshade, as follows:

**Counts 1 and 2** – Alter ego claims against Fritzel and his companies, Heartland and JST Holdings, LLC ("**JST**"), seeking to hold all three jointly and severally liable for Malul's other claims for damages.

**Count 3** – Contract claim for an accounting from Heartland and Fritzel under the Subscription Agreement.

**Count 4** – Breach of contract claims against Fritzel and Heartland seeking a money judgment for liquidated damages under the Subscription Agreement (i.e., a percentage of Heartland and Fritzel's profits from operating the business wrongfully diverted from Malul's investment vehicle).

**Count 5** – Contract claim for breach of the implied covenant of good faith and fair dealing in the Subscription Agreement.

**Count 6** – Statutory claim for breach of fiduciary duty against Fritzel pursuant to Colo. Rev. Stat. §§ 7-61-110 and 7-8-404.

**Count 7** – Claim against Lightshade for aiding and abetting Fritzel's breaches of fiduciary duty.

**Count 8** – Equitable claim for money judgment on an unjust enrichment theory against Fritzel.

**Count 9** – Equitable claim to impose a constructive trust on Fritzel's assets wrongfully diverted from Heartland.

**Count 10** –  Statutory civil theft claim against Fritzel seeking three times actual damages pursuant to Colo. Rev. Stat. § 18-4-405.

**Count 11** – Equitable claim for civil conspiracy against Fritzel and Lightshade for usurping business opportunities which would have otherwise inured to the benefit of Heartland's investors.

**Count 12** – Common law conversion claim against Lightshade and Fritzel.

**Count 13** – Claim against Lightshade, Heartland, and Fritzel for declaratory judgment that Malul is a member/partner in Lightshade on

account of her investment in Heartland and Fritzel's subsequent usurpation, and is entitled to payment of her pro rata share of profits as set forth in the Subscription Agreement.

## B.   Proceedings upon Reopening the Bankruptcy Case

Upon reviewing the Motion to Reopen, the Court was seriously concerned this case would require administration of marijuana assets, which remain illegal under Federal Law.  However, in the Reopen Supplement, Malul expressly represented, on the Petition Date, "there existed no tangible assets or claims against third parties related to the marijuana industry."[19] Based solely on these representations, on February 6, 2019, the Court entered an Order conditionally reopening this bankruptcy case.[20]  The Court carefully explained its hesitancy in granting the Motion to Reopen, and left the door open for parties in interest to challenge the administration of this case given its connections to the marijuana industry, with any such challenges being considered *de novo*.[21]

Shortly after the Reopening Order was entered, Jeanne Y. Jagow ("**Trustee**") was appointed successor Chapter 7 Trustee.[22]  Thereafter, Malul filed an Amended Schedule A/B disclosing her 30% interest in Heartland as well as her claims against Fritzel.[23]  Malul also filed an amended Schedule C claiming to exempt her claims against Fritzel from the estate pursuant to Colo. Rev. Stat. § 13-54-104, which provides certain earnings of an individual debtor are not subject to attachment by creditors.[24]

On March 14, 2019, Fritzel made his first appearance by filing an Objection to the Exemption.[25]  The next day, the Trustee filed her own objection to the Exemption.[26]  Both exemption objections make the basic assertion Malul's interest in the State Court Action do not constitute

---

[19] Reopen Supplement at ¶ 14.

[20] ECF No. 53 ("**Reopening Order**").

[21] *Id.*

[22] ECF No. 54.

[23] ECF No. 58.

[24] ECF No. 56 ("**Exemption**").

[25] ECF No. 62.

[26] ECF No. 64.

"earnings" for purposes of Colo. Rev. Stat. § 13-54-104. Ultimately, Malul capitulated to the objections to the Exemption and filed a further amended Schedule C claiming no exemption in the State Court Action.[27]

On May 8, 2019, Malul initiated the "main event" in this reopened case by filing a Motion to Compel Abandonment of her interest in Heartland and the State Court Action.[28] Interestingly, despite Malul's prior emphatic representations regarding the lack of marijuana assets in this case, the Abandonment Motion asserts while there are no "ongoing violations" of federal law, the assets at issue "constitute unvested rights to proceeds derived from the overt and ongoing sale of marijuana[.]"[29] Based on this assertion, Malul argues her interests in Heartland and the State Court Action cannot be administered by the Trustee, whether through settlement or sale, without violating federal criminal law.[30] Additionally, notwithstanding the marijuana issues, Malul also argued the claims presented in the State Court Action are not property of the estate because they did not accrue until 2016, when Malul and other investors saw the Denver Post article about Fritzel.[31]

Two days later, on May 10, 2019, the Trustee made clear her intentions by filing a Motion for Approval of an agreement reached with Fritzel to settle the claims in the State Court Action.[32] In pertinent part, the proposed Settlement Agreement releases all Malul's claims asserted in the State Court Action in exchange for a payment to the estate of $100,000. Importantly, the Settlement Agreement is expressly conditioned on Fritzel's ability to "make the settlement payment with traceable funds that do not originate from a marijuana enterprise."[33]

---

[27] ECF No. 69.

[28] ECF No. 74 ("**Abandonment Motion**").

[29] *Id.*

[30] *Id.* ("Trustee, who has control over the membership interest in Heartland would be engaging in post-petition marijuana-related activity by selling that membership interest[.]").

[31] *Id.*

[32] ECF No. 81 ("**Settlement Motion**") and ECF No. 81-1 ("**Settlement Agreement**").

[33] *Id.*

6

Patrick S. Layng, the United States Trustee for Region 19 ("**US Trustee**"), opposed the Settlement Motion.[34]  In his objection, the US Trustee argues consummation of the Settlement Motion unavoidably requires the Trustee to engage in illegal activity by seeking "to recover the debtor's investment in a marijuana business from a related marijuana business or alter ego of the marijuana business."[35]  The US Trustee maintains Malul's interest in Heartland and Malul's claims in the State Court Action are all illegal contracts which the Trustee lacks standing to enforce.[36]

While the Court had the Abandonment Motion and the Settlement Motion under advisement, the US Trustee escalated its opposition to the Trustee's proposed course by filing a Motion to Vacate Order Conditionally Reopening Case.[37]  In the Motion to Vacate, the US Trustee argues Malul was not entirely candid with the Court regarding the marijuana issues present in this case.  Specifically, the US Trustee argues Malul was "not candid that her real interest was to continue her state court litigation and not to permit the administration of her investment interest for the benefit of creditors.  And thus she seeks to enlist the Court's help to effectuate a transfer of non-exempt illegal marijuana interests to her and help to improve her litigation posture in state court."[38]  The US Trustee asserts Malul disingenuously caused the Court to reopen this case "to allow 'a trustee to administer Debtor's interest in Heartland,'" but then "began vigorously opposing the Trustee's efforts to administer the interest in Heartland and the marijuana-related claims."[39]

Importantly, the Motion to Vacate invokes the Court's initial promise, through the Reopening Order, to consider any future objections to the reopening of the case on account of the marijuana issues on a *de novo* basis.  Thus, the US Trustee does not merely seek dismissal and re-closing of this case, but an order vacating all proceedings since the Reopening Order and returning the parties to the *status quo ante*.

---

[34] ECF No. 104.

[35] *Id.*

[36] *Id.*

[37] ECF No. 113 ("**Motion to Vacate**").

[38] *Id.*

[39] *Id.*

## <u>ANALYSIS</u>

**A.    Legal Framework for Marijuana-Related Bankruptcy Cases**

Pursuant to the Controlled Substances Act of 1970 ("**CSA**"),[40] marijuana[41] is designated a Schedule I controlled substance under federal law.[42]  Therefore, under the CSA, it is a federal crime to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]"[43]  The CSA also expressly provides any person who "conspires to commit any offense" under the CSA shall be subject to the same penalties as the principal.[44]

Notwithstanding the absolute federal prohibition on the use, sale or cultivation of marijuana, several states, including Colorado, have legalized marijuana for both medicinal and recreational use.[45]  In *Gonzales v. Raich*, the U.S. Supreme Court definitively held the federal government's designation of marijuana as a controlled substance supersedes contrary state law through application of the commerce clause.[46]  As a result, there remains an ever-shifting landscape of federal enforcement of marijuana criminalization where the same activity is fully legal under state law.[47]

Of course, bankruptcy laws and bankruptcy courts are purely creatures of federal law.  Accordingly, bankruptcy courts have consistently dismissed cases where debtors engaged in ongoing CSA violations, or where a debtor's

---

[40] Unless otherwise specified, all references herein to "CSA Section," "CSA §,"and "CSA" refer to the Controlled Substances Act, Title 21 U.S.C. § 101, *et seq*.  All references to "Code Section," "Code §" and "Bankruptcy Code" refer to Title 11, U.S.C. § 101, *et seq*.

[41] The CSA refers to cannabis and marijuana products as "marihuana."

[42] CSA § 812.

[43] CSA § 841(a)(1).

[44] CSA § 846.

[45] *See* Colo. Const., Art. XVIII, Sections 14 and 16 (legalizing marijuana for medical and recreational use, respectively).

[46] *Gonzales v. Raich*, 545 U.S. 1 (2005).

[47] *See, e.g.,* James M. Cole, Deputy Attorney General, MEMORANDUM FOR ALL UNITED STATES ATTORNEYS: GUIDANCE REGARDING MARIJUANA ENFORCEMENT (Aug. 29, 2013) (commonly known as the "**Cole Memo**"); *but see* Jeffrey B. Sessions, Attorney General, MEMORANDUM FOR ALL UNITED STATES ATTORNEYS: MARIJUANA ENFORCEMENT (January 4, 2018) (revoking the Cole Memo).

reorganization efforts depend on funds that can be considered proceeds of CSA violations.[48]

## B. Connecting Prohibited Acts under the CSA to the Bankruptcy Code

As previously stated, it is a federal crime to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]"[49]  However, this is not a case where mere application of CSA § 841(a)(1) provides a complete solution, because neither Malul nor the Trustee are engaged in actively producing, distributing or selling marijuana.  Instead, Malul has a somewhat roundabout connection to the marijuana industry, arising indirectly through Malul's ownership interest in Heartland, the diversion of its assets to Lightshade, and Malul's resulting claims in the State Court Action.

A bedrock principle of contract law is that contracts in contravention of public policy are void and unenforceable.[50]  Colorado has affirmed this principle, holding that the subject matter of a contract involving a marijuana business is illegal and therefore, unenforceable.[51]  The Tenth Circuit Court of Appeals has followed this general law against enforcement of illegal contracts.[52]  Generally, this principle extends to bankruptcy trustees, preventing the enforcement of illegal contracts by a bankruptcy estate.[53]

---

[48] *See In re Way to Grow, Inc.*, 597 B.R. 111, 120 (Bankr. D. Colo. 2018) (holding a party cannot seek bankruptcy relief "while in continuing violation of federal law" or "where the trustee or court will necessarily be required to possess and administer assets which are illegal under the CSA or constitute proceeds of activity criminalized by the CSA.").

[49] CSA § 841(a)(1).

[50] *Mason v. Orthodontic Centers of Colorado, Inc.,* 516 F. Supp. 2d 1205, 1212 (D. Colo. 2007) ("It is a long-standing axiom of contract law that a contractual provision is void if the interest in enforcing the provision is clearly outweighed by a contrary public policy") (citing *FDIC v. American Cas. Co.,* 843 P.2d 1285, 1290 (Colo.1992), and *Restatement (Second), Contracts,* § 178).

[51] *Haeberle v. Lowden*, No. 2011CV709 (Colo. Dist. Ct. 2012) ("Contracts for the sale of marijuana are void as they are against public policy …. Accordingly, the contract here is void and unenforceable.").

[52] *See* McCracken v. Progressive Direct Ins. Co., 896 F.3d 1166, 1172 (10th Cir. 2018) ("Colorado courts will not enforce a contract that violates public policy")(quoting *Rademacher v. Becker*, 374 P.3d 499, 500 (Colo. App. 2015)).

[53] *See Sender v. Buchanan (In re Hedged-Investments Assocs., Inc.)*, 84 F.3d 1281 (10th Cir. 1996) (trustee could not use bankruptcy court to enforce illegal partnership agreement based on the "elementary principle that one who has himself participated in a violation of

This raises significant questions as to whether an investment contract with a nexus to a marijuana business is enforceable as a matter of law, especially in the bankruptcy context.

Against this backdrop, a line of cases has emerged regarding various gray areas in the applicable law.  In Colorado, the most cited authority on this issue is *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*[54]  In *Green Earth Wellness*, a medical marijuana business sued its insurance carrier for failure to compensate the company for marijuana plants and equipment destroyed in a fire.[55]  The insurer argued it was excused from performance under the insurance contract due to the illegality of the marijuana business.[56]  The specific question before the court in *Green Earth Wellness* was "'whether, in light of [federal and state law], it is legal for [the insurer] to pay for damage to marijuana plants and products, and if so, whether the Court can order [it] to pay for those damages.'"[57]

The court somewhat recharacterized the question by avoiding giving "assurances" of legality, and instead explained the court "merely interprets and applies the terms of the Policy."[58]  Thus, "[a]ny judgment issued by this Court will be recompense to Green Earth based on Atain's failure to honor its contractual promises, not an instruction to Atain to 'pay for damages to marijuana plants and products.'"[59]  Ultimately, the court in *Green Earth Wellness* declined to declare the insurance contract void on public policy grounds because "Atain, having entered into the Policy of its own will, knowingly and intelligently, is obligated to comply with its terms or pay damages for having breached it."[60]

At oral argument, Malul attacked the relevance of *Green Earth Wellness* on two grounds.  First, Malul argued *Green Earth Wellness* is

---

law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.").  *See also Sender v. Simon*, 84 F.3d 12989 (10th Cir. 1996).

[54] *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821 (D. Colo. 2016).

[55] *Id.* at 823.

[56] *Id.*

[57] *Id.* at 834.

[58] *Id.*

[59] *Id.*

[60] *Id.* at 835.

inapplicable because it was evaluating the legality of state insurance laws, not necessarily federal drug laws.  Second, Malul argued the insurance policy in *Green Earth Wellness* is a different situation to a declaratory judgment or breach of fiduciary duty claim, because there is an underlying equity interest at stake in the latter.  The Court agrees the facts of *Green Earth Wellness* are distinguishable in these respects, but it is not clear whether, or how, those factual differentiators mediate a different result.  Rather, the operative decision point in *Green Earth Wellness* was Judge Krieger's careful distinction between ordering the insurer to pay for damages to specific items (i.e., marijuana plants) and merely ordering compliance with the contract, which could be accomplished without reference to the existence of any marijuana asset.  Presumably, if the insurance contract specifically required Atain to replace the marijuana plants rather than merely compensate Green Earth for their value, the result would have been different.

The opinion of the U.S. District Court for the Northern District of Texas in *Ginsburg v. ICC Holdings, LLC*, is instructive.[61]  In *Ginsburg*, ICC Holdings solicited funding for their medical marijuana business from Ginsburg.[62] Through a private placement memorandum, Ginsburg loaned ICC Holdings $7 million, evidenced by a promissory note convertible to ICC stock.[63] Ginsburg subsequently loaned an additional $3.6 million, evidenced by a second convertible promissory note.  Ginsburg later learned ICC Holdings materially misled him by providing false information and projections in soliciting Ginsburg's investment.[64]  Ginsburg filed a lawsuit against ICC Holdings, asserting claims for breach of contract based on ICC's alleged default under the two promissory notes, as well as statutory claims under Texas's business and commercial code, both state and federal securities laws, and the federal Racketeer Influenced and Corrupt Organizations Act.[65]

ICC Holdings moved to dismiss, arguing that "because the purpose of the Notes is to fund the cultivation, possession, and sale of marijuana, in violation of federal law, the Notes are void and unenforceable because they

---

[61] *Ginsburg v. ICC Holdings, LLC*, No. 3:16-CV-2311-D, 2017 WL 5467688 (N.D. Tex. Nov. 13, 2017).

[62] *Id.* at *1.

[63] *Id.*

[64] *Id.* at *2.

[65] *Id.* at *3.

contravene public policy."[66]  The court noted because illegality is an affirmative defense, dismissal under Fed. R. Civ. P. 12(b)(6) would not be appropriate "unless the defense appears clearly on the face" of the complaint.[67]  Thus, the court set out to determine whether the notes were "intrinsically illegal."[68]  Here, the court noted, due to the fungibility of currency, repayment of the notes would not require ICC Holdings to "manufacture, distribute, dispense, or possess marijuana."[69]

"In other words, even if the Notes concern an illegal object (*i.e.*, a violation of the CSA), it is possible for the Court to enforce the Notes in a way that does not require any party to engage in illegal conduct."[70]  Ultimately, while noting federal courts do not take a "black-and-white" approach to unenforceability for illegality, the court explained "[a]lthough the court does not suggest that a contract with the purpose of funding an organization that is violating or intends to violate federal law is necessarily enforceable, or that, in this case, the Notes are themselves enforceable, it concludes at the Rule 12(b)(6) stage that defendants have not established from the face of the [complaint] that the Notes are void and unenforceable."[71]

Taken together, *Green Earth Wellness* and *Ginsburg* stand for the proposition contracts that can be performed without violating the CSA are likely enforceable even if the transaction's subject matter involves CSA violations.  In both cases, the underlying contracts would require no more than the payment of money, which is not *per se* illegal under federal law.

A very recent opinion of the Bankruptcy Appellate Panel for the Ninth Circuit provides further clarification.  In *Burton v. Maney*, the appellate panel upheld the dismissal of a Chapter 13 case based on debtor's ownership of an

---

[66] *Id.*

[67] *Id.* at *7.

[68] *Id.*

[69] *Id.* at *8 (citing *Mann v. Gullickson,* 2016 WL 6473215 at *7 (N.D. Cal. Nov. 2, 2016) (enforcing contract for sale of marijuana business by requiring purchaser to pay purchase price, which could be accomplished without engaging in any CSA violations) and *Energy Labs, Inc. v. Edwards Engineering, Inc.*, 2015 WL 3504974 at *4 (N.D. Ill. 2015) (requiring defendants to pay for air conditioning units acquired in connection with marijuana business, because fulfilling obligations under purchase order did not violate CSA)).

[70] *Id.*

[71] *Id.* at *9.

interest in an entity that was involved in litigation seeking to recover damages for breach of contracts related to growing and selling marijuana.[72] Specifically, the Burtons' bankruptcy estate included a 65% membership in Agricann and certain affiliates.[73]  Postpetition, Agricann filed a state court lawsuit against Total Accountability Systems I, Inc. and Cannabis Research Group, seeking damages for breach of contracts under which Agricann was to cultivate, grow and sell marijuana.  Understandably concerned with these facts, the bankruptcy court entered an order to show cause requiring the Burtons to demonstrate why their case should not be dismissed due to their ownership interest in, and deriving income from, an entity involved in the marijuana industry.[74]

In their response, the Burtons denied having an interest in an entity involved in the marijuana industry.  The Burtons "stated that Agricann went out of business in 2016 and had generated no income since then. As such, they claimed they did not currently derive income from any entity involved in the marijuana industry. . . .  The Burtons also stated their intention to abandon from the estate their interest in Agricann, after which they would divest themselves of their interest in that entity."[75]  Indeed, shortly after filing their response to the Order to Show Cause, the Burtons filed a motion to compel abandonment of their interest in Agricann.[76]

After hearing the parties' arguments, the bankruptcy court held "that dismissal was appropriate under the circumstances because, despite the assertion Agricann was no longer in the medical marijuana business it was seeking recovery in the state court ligation" in the form of

> funds attributable to contracts under which it was to serve as a cultivator, grower, holder, deliverer, and/or seller of marijuana. Any recovery from the litigation would be derived from conduct that is illegal under federal law. Any distributions from Agricann to its members, specifically the Debtors, would also be derived from illegal conduct. . . .

---

[72] *Burton v. Maney (In re Burton)*, 610 B.R. 633 (9th Cir. BAP 2020).

[73] *Id.* at 634.

[74] *Id.* at 635.

[75] *Id.* at 636.

[76] *Id.*

Given the nature[] of Agricann's business, which was clearly involvement in the marijuana industry, neither a case trustee, nor these Debtors, can sell or liquidate the 65 percent ownership interest in Agricann, which is property of this estate through the bankruptcy case. This would necessitate the Court and the Trustee's involvement in condoning the illegal activity.[77]

On appeal, the appellate panel first noted the absence of a *per se* prohibition on continuing bankruptcy cases with marijuana connections, explaining "the stated reluctance in this Circuit to adopt per se bright-line rules requiring the immediate disposition of bankruptcy cases in which marijuana is present, and the flexible standard under § 1307(c), coupled with the abuse of discretion standard of review on appeal, give bankruptcy courts appropriate latitude to deal with these variations."[78]  With this in mind, the appellate panel affirmed the finding of cause for dismissal "because the continuation of the case would likely require the trustee or the court to become involved in administering the proceeds of the Agricann litigation, which the court implicitly found would be tainted as proceeds of an illegal business."[79]  The panel went on to explain

Whether Agricann is currently actively engaging in growing or selling marijuana is irrelevant, given that Agricann is a plaintiff in litigation seeking to recover damages consisting at least in part of profits lost as a result of breaches of contracts related to the growing and selling of marijuana.  As such, any proceeds received from the litigation would represent profits from a business that is illegal under federal law. . . .  [The bankruptcy court] based its ruling on the undisputed fact that Agricann, in which the Burtons held a membership interest, was a plaintiff in litigation seeking recovery for breaches of contract relating to growing and selling marijuana.[80]

Finally, the Burtons argued "that the bankruptcy court erred in concluding that they were involved in any business activities that violated the CSA, such as manufacturing, distributing or dispensing marijuana.  They also contend that dismissal was not warranted because they did not propose

---

[77] *Id.* at 636-37.

[78] *Id.* at 639.

[79] *Id.*

[80] *Id*

to fund their plan with proceeds generated by the illegal marijuana business."[81]

The appellate panel rejected this argument, explaining "the court's ruling was not based on those factors; its concern was that any litigation recovery entering the bankruptcy estate would constitute proceeds from a federally prohibited business, regardless of whether or not the business was still engaged in activities prohibited by the CSA."[82]

There is a critical difference in the nature of the litigation claims at issue in *Burton* compared to *Green Earth Wellness* and *Ginsburg.* Specifically, both those cases turned on the ability of the defendant, if it was found liable, to satisfy any damage reward with funds from any source, not necessarily a marijuana-related source, due to the fungibility of currency. This was because the breach of contract claims in *Green Earth Wellness* and *Ginsburg* were based on promissory notes that merely required payment in a specified amount within a specified time.[83] The contracts were not in any way dependent on the circumstantial existence of a marijuana business. In contrast, the damages underlying the Burtons' litigation claims arose entirely out of the Burtons' ownership of an interest in an entity created for the specific purpose of engaging in CSA violations. There would be no litigation recovery but for the existence of the equity interest, and therefore the only possible damages to be recovered were direct proceeds of an illegal venture.

Thus, the litigation claims being pursued by Agricann in *Burton* were akin to the hypothetically unenforceable claim discussed in *Green Earth Wellness* where the plaintiff seeks payment "for damages to marijuana plants and products" as opposed to simply seeking "payment." While *Green Earth Wellness* confirms the legality of a contract to replace destroyed marijuana plants with currency of equal value, *Green Earth Wellness* also stands for the inverse proposition that a contract promising to replace lost marijuana plants with substitute plants, rather than their value, would be illegal and unenforceable. *Burton*, then, stands for the proposition that a bankruptcy judge may exercise his discretion to terminate a bankruptcy case involving prosecution of legal claims of this type.

---

[81] *Id.* at 640.

[82] *Id.*

[83] Although the contracts in *Ginsburg* arose from an investment, the claims arise from promissory notes in sums certain, rather than claims for a percentage of the profits from the business.

15

This distinction is further supported by the existence of CSA § 854. This section is entitled "Investment of illicit drug profits" and provides in pertinent part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a violation of this subchapter or subchapter II punishable by imprisonment for more than one year in which such person has participated as a principal within the meaning of section 2 of Title 18, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.  A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this section if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any violation of this subchapter or subchapter II after such purchase do not amount in the aggregate to 1 per centum of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

Pursuant to CSA § 854(c), "enterprise" is defined broadly to "include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Additionally, CSA § 854(d) expressly confirms the breadth of the statute's application, providing "[t]he provisions of this section shall be liberally construed to effectuate its remedial purpose."

Under CSA § 854, it was illegal for Fritzel to incorporate Heartland, to solicit investments in Heartland, and to sell securities in Heartland. Concomitantly, it was illegal for Malul to execute the Subscription Agreement and to own an interest in Heartland, and it would have been illegal for Malul to accept distributions from Heartland on account of those interests.[84]  The illegality does not depend on any violation of CSA § 841 with respect to cultivating or distributing marijuana, nor the temporal aspect of such

---

[84] Malul's criminal violations as of execution of the Subscription Agreement could arise either directly under CSA § 854, or on a theory of complicity pursuant to CSA § 846 and 18 U.S.C. § 2.  Specifically, Malul's knowing entry into the Subscription Agreement, which expressly required Fritzel to violate the CSA, meets all the elements for criminal conspiracy. *See In re Way to Grow, Inc.*, 597 B.R. at 124-125.

violations, but rather, the illegality arose immediately upon the creation of Malul's equity interest by virtue of CSA § 854. Accordingly, the incidental fact Heartland never operated as intended is wholly irrelevant. There simply is no conceivable circumstance where Malul would have claims except by virtue of owning a *per se* illegal asset. The specific legal theory underlying the claims is irrelevant because, one way or another, Malul's damages will be calculated as the difference between the present value of her interest in Heartland's assets and earnings and the value those interests would represent but for Fritzel's alleged misdeeds.

The Court finds further support for this conclusion in the CSA's provisions for asset forfeiture. Pursuant to CSA § 853(a), all property, and proceeds of such property, obtained in violation of the CSA is subject to forfeiture. CSA § 853(b)(2) defines property subject to criminal forfeiture broadly to include "tangible and intangible personal property, including rights, privileges, interests, claims and securities."

Additionally, pursuant to CSA § 881,[85] assets subject to forfeiture include

> All moneys, negotiable instruments, **securities, or other things of value** furnished or **intended to be furnished** by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.[86]

Here, the forfeiture asset is Malul's ownership interest in, or right to claim an ownership interest in, Heartland. Stated differently, the asset consists of all rights Malul acquired upon executing the illegal Subscription Agreement. Pursuant to CSA § 881, Malul's investment in Heartland is a "security" or "other thing of value" traceable to an illegal exchange, as well as a security "used or intended to be used to facilitate any violation" of the CSA. Therefore, all of Malul's interests in Heartland, arising in whatever form out of the Subscription Agreement, are assets subject to forfeiture under CSA § 881. Further, pursuant to the plain language of CSA

---

[85] Solely for purposes of this Order, the Court sees no practical difference between the forfeiture provisions in CSA §§ 853 and 881.

[86] CSA § 881 (emphasis added).

§ 853(b)(2), the property subject to forfeiture encompasses "intangible personal property" including "claims."

Still, Trustee may argue she has interests in property of the estate superior to the government's forfeiture rights.  The law on this issue is aptly summarized by the American Bankruptcy Institute Journal article attached as Exhibit F to the Motion to Reopen.[87]  There, the author argues:

> There are two classes of assets that are subject to forfeiture under the Controlled Substances Act: tainted property and substitute property.  Tainted property consists of those assets that constitute proceeds of or are otherwise derived from criminal activity.  Substitute property consists of "untainted property that the government may seize to satisfy a forfeiture judgment if the tainted property is unavailable."  With respect to tainted property, the government's right to the property relates back to the time of the act giving rise to the right of forfeiture.  Therefore, it is likely that the government's interest in tainted assets will be superior to the rights of a bankruptcy trustee appointed after a debtor engaged in the marijuana trade.

> However, with respect to substitute property, the government's rights do not relate back.  Consequently, upon the filing of a bankruptcy petition, a bankruptcy estate may well obtain rights to untainted substitute property that are superior to the government's.  In the normal order of things, this property would be distributed to creditors, including the government under 11 U.S.C. § 726 (a) (4).  However, dismissal of a bankruptcy case where the estate includes tainted and untainted property allows the government to seek forfeiture of substitute property without the hindrance of claims that would take priority under the Bankruptcy Code.[88]

The operative language of CSA § 853(c), regarding the government's priority in the case of third-party transfers of property subject to forfeiture, vests the government's interest "upon the commission of the act giving rise to forfeiture."  Here, the criminal act giving rise to forfeiture was Malul's execution of the Subscription Agreement.  At that moment, all "rights,

---

[87] Motion to Reopen at Exh. F, Stephen J. Boyajian, *Just Say No to Drugs?  Creditors Not Getting a Fair Shake when Marijuana-Related Cases are Dismissed*, 36 Am. Bankr. Inst. J. 9 (2017).

[88] *Id.* (internal citations omitted).

18

privileges, interests, claims and securities" Malul acquired under the Subscription Agreement became subject to criminal forfeiture.  Thus, Malul's litigation claims are not "substitute property" but the original "tainted property" itself.

## C.      Revisiting the Reopening Order

Based on the foregoing, the Court rejects Malul's argument there is no ongoing CSA violation in this case by virtue of Heartland having no assets or operations.  Those facts may establish the lack of a continuing violation of CSA § 841.  However, the criminal violation in this case arises under CSA § 854, which looks at the actual or intended purpose of Malul's investment at the time at the time she acquired her interest in Heartland.  Malul's mere possession of those rights and interests, and certainly her prosecution of litigation claims in furtherance of those rights and interests, constitute ongoing criminal violations of the CSA.

Malul's violation of CSA § 854 (or her complicit liability for such violations) is not contingent on the theory Malul merely has an unvested right to recover on litigation claims, as Malul argues.  Rather, the violation arises from Malul's existing right to share in the profits of a marijuana business, whatever those profits may be, and through whichever legal vehicles or claims become necessary as future events unfold.  These rights vested when Malul executed the Subscription Agreement on April 30, 2010. Malul's ownership of the rights conferred under the Subscription Agreement exist today precisely as they did on April 30, 2010, and Malul's ownership thereof is a continuing CSA violation.  Necessarily, this conclusion also prohibits Trustee from settling Malul's claims in the State Court Action, as doing so would constitute administration of an illegal asset.

The Court's finding of an ongoing violation of the CSA places this case squarely within the existing case law on dismissal of marijuana-related bankruptcy cases.[89]  On the one hand, allowing Malul to schedule the claims while also requiring Trustee to abandon them would confer a federal benefit upon Malul while she is engaged in an ongoing violation of federal law.  On the other hand, Trustee cannot do anything regarding those claims without administering an illegal asset.

Because the Court can grant neither the Motion to Abandon nor the Settlement Motion, the Court is left only with the US Trustee's Motion to Vacate.  The US Trustee raised several grounds upon which the Court could find a lack of cause to reopen this bankruptcy case, including the lack of

---

[89] *See* n. 48, *supra.*

assets to administer, futility, and equitable considerations such as judicial estoppel, laches, unclean hands and a lack of good faith.

Regardless of how the US Trustee frames the issue, it is clear the Court would not have entered the Reopen Order had it known then what it knows now.  Specifically, the Reopen Order was based entirely upon the Court's conclusion "[a]n interest in an entity with no assets and no operations is not a 'marijuana asset.'  Bringing Debtor's interest in Heartland into this bankruptcy case would not associate this Court with ongoing violations of federal law."[90]

The Court made the Reopen Order conditional precisely because it lacked faith in the veracity of this conclusion under the facts of this case. With the benefit of the parties' subsequent substantial briefing and argument, for the reasons set forth herein, the Court now concludes its prior holding in the Reopen Order was improvident.  Because the Reopen Order was premised on Malul's flawed theories, the Court must vacate the Reopen Order.

The Court's intent in voiding the reopening of this case *ab initio* is to return all parties to the *status quo ante*.  This means the Court need not address whether Malul's litigation claims are property of the estate.  Those issues should be addressed by the State Court in connection with Fritzel's statute of limitations defense.  Similarly, the Court need not address any of the parties' arguments regarding estoppel because the effect of these renewed proceedings, if any, is a matter for the State Court's determination. The Court merely holds, on a *de novo* review, that it was improvident to reopen this bankruptcy case, and no more.

## CONCLUSION

The result in this case emphasizes the need for professionals advising marijuana investors and entrepreneurs to account for the full breadth of prohibited acts under the CSA.  There is only so much prospective guidance a bankruptcy court can offer on how any potential CSA violation will affect any particular bankruptcy case.  The law on these issues is not only in its infancy, but the results are highly fact specific.

In this case, Malul's arguments regarding the lack of an ongoing marijuana operation or marijuana assets, even if correctly evidencing the lack of an ongoing violation of CSA §§ 841, 842 or 843, missed the *ab initio* illegality separately arising under CSA § 854 the moment the Subscription

---

[90] Reopen Order at p. 3.

Agreement was executed.  Perhaps such nuances call for extensive consultation with legal professionals having specific expertise in the prosecution or defense of CSA violations, in addition to consultations with experts in bankruptcy or general business law.  Ultimately, participants in the marijuana industry will continue to experience difficulty and uncertainty in predicting the outcome of any particular marijuana-related bankruptcy case unless and until Congress provides a legislative solution to the divergent federal and state drug laws.

The Court may enjoy the opera, but anxiously awaits the fat lady's song.

For the foregoing reasons, it is ORDERED as follows:

1.      The Motion to Vacate [ECF No. 113] is GRANTED.

2.      The Court's Order Reopening this Case [ECF No. 53] is VACATED and the Motion to Reopen is DENIED.  The parties are authorized and directed to take any and all actions necessary to re-establish the *status quo ante* as of February 6, 2019.

3.      The Clerk of the Court shall re-mark this case as CLOSED.

4.      All pending motions and requests for relief not otherwise addressed in this Order are DENIED AS MOOT, including (without limitation) the Motion to Abandon [ECF No. 74], the Settlement Motion [ECF No. 81] and the Motion to Terminate Employment of Trustee's Attorney [ECF No. 101].

Dated March 24, 2020                              BY THE COURT:

Michael E. Romero, Chief Judge
United States Bankruptcy Court

21